In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 25-3131

DUPONT WATER COMPANY, INC.,

*Plaintiff-Appellant,*

*v.*

CITY OF MADISON, INDIANA,

*Defendant-Appellee,*

*and*

JEFFERSON COUNTY, INDIANA,

*Intervenor-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:23-cv-00041-SEB-KMB — **Sarah Evans Barker**, *Judge.*

———————————

ARGUED MAY 18, 2026 — DECIDED AUGUST 5, 2026

———————————

Before SCUDDER, KIRSCH, and TAIBLESON, *Circuit Judges.*

TAIBLESON, *Circuit Judge.* Jefferson County, Indiana, built a new jail on an undeveloped plot of land near Madison, which is a small municipality on the Indiana-Kentucky border. The

jail needed water, and there were two potential suppliers: the City of Madison and Dupont Water Company. Dupont is a rural water association that, by virtue of its outstanding debt to the federal government, has some monopoly rights in its service area under a federal statute, 7 U.S.C. § 1926(b). The County thus tried to procure water for the jail from Dupont — but to no avail, as Dupont failed to build the necessary infrastructure or even quote a price after many months of communication. So the County instead procured water from Madison, which serves the jail to this day.

Dupont sued, claiming that Madison violated Dupont's monopoly rights under § 1926(b) by selling water to the jail. The district court granted summary judgment in favor of Madison and Jefferson County, finding no evidence that Dupont had "provided or made available" water service to the jail as is required to trigger § 1926(b)'s protections. We affirm.

## I. Background

### A.  Section 1926(b)

In 1961, Congress passed the Consolidated Farmers Home Administration Act, 7 U.S.C. § 1921 *et seq.* As relevant here, the law empowered the United States Department of Agriculture ("USDA") to assist rural and agricultural water facilities, with the goal of improving access to affordable and safe water for farmers and rural communities. In its current form, the law authorizes the USDA to "make or insure loans to associations, including corporations not operated for profit," to provide for "the conservation, development, use, and control of water, … primarily serving farmers, ranchers, farm tenants,

farm laborers, rural businesses, and other rural residents." 7 U.S.C. § 1926(a)(1).

Under the law, water associations that hold these USDA loans are protected from certain forms of competition:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

*Id*. § 1926(b).

We have had few occasions to interpret and apply this unusual statute, which grants some form of legal monopoly to these federally indebted water associations. The first was in *Jennings Water, Inc. v. City of North Vernon*, in which we considered what type of competition is prohibited by § 1926(b). 895 F.2d 311 (7th Cir. 1989). Beginning with the text, we explained that "[t]he statute explicitly prohibits municipal encroachment on a rural water association's service area" in two ways: "by means of annexation or grant of private franchise." *Id.* at 314. But we concluded that the statute "should be given a liberal interpretation that protects rural water associations … from municipal encroachment" more broadly. *Id.* at 315. As

a result, we held that § 1926(b) "prohibits *any* curtailment or limitation by a municipality on the service provided" by a USDA-indebted rural water association, not just the types "explicitly listed in the statute's prohibition." *Id.* at 315, 318 (emphasis added). Under *Jennings Water*, § 1926(b) therefore prohibits a municipality from selling water in a USDA-indebted water association's service area.

Over thirty years later, in *Washington County Water Co. v. City of Sparta*, we examined what it means for a rural water association to have "provided or made available" its service. 77 F.4th 519, 522 (7th Cir. 2023) (citation omitted). The answer to that question determines the geographic service area protected from competition by § 1926(b). *Id.* Following the approach of other circuits, we employed a two-pronged "physical capability" test to measure a water association's protected service area. *Id.* (citation omitted). First, the water association must have "pipes in the ground," meaning "water pipes either within or adjacent to the disputed area" such that it is "capable of providing service to the disputed area within a reasonable time after a request for service occurs." *Id.* (citation omitted). And second, the association must have the "legal right under state law to provide water to the disputed area." *Id.* (citation omitted).

Dupont is a USDA-indebted rural water association, organized as a non-profit corporation owned by its members. It invokes § 1926(b)'s protections here, claiming that Madison violated the statute (as interpreted in *Jennings Water*) by taking on the new Jefferson County jail as a water customer. The parties agree that under our precedent, Dupont must establish that it "provided or made available" water to the jail to prove a violation of § 1926(b). The dispute here turns on

whether Dupont had "pipes in the ground" that rendered it "capable of providing service to the disputed area within a reasonable time after a request for service occurs." *Washington Cnty.*, 77 F.4th at 522 (citation omitted).

### B. The Jail Project

Jefferson County identified the site for its new jail in 2020, which was a plot of land just outside Madison city limits. At the time, Dupont had a three- or four-inch water main at the property, while Madison had a twelve-inch water main across the street, but neither party was servicing the site.

Jefferson County engaged DLZ Corporation to manage construction of the jail. In July of 2020, a DLZ engineer emailed Dupont about the project, noting that he would soon have preliminary information about "what is anticipated for the Water Main to the building," at which point the parties could "start discussing more of the specifics" like "meter location, backflow preventer type, whether the fire protection & domestic water feeds to the building need to be separate, etc." The engineer signed off by telling Dupont that DLZ "look[s] forward to working with you on the project!"

Communications between Jefferson County, DLZ, and Dupont about the jail project continued throughout 2020. By October 19, Dupont's Board President and its water superintendent had spoken to DLZ engineers about the "water specs" for the jail and learned that the project would require a larger water main than Dupont had in the ground near the jail. In theory, that issue was redressable: Dupont generally purchases all its water from Madison, anyway, and its pipes were connected to Madison's in certain other contractually

specified locations, so Dupont might be able to connect to Madison's 12-inch water main next to the jail as well.

On October 29, a DLZ engineer emailed Dupont's water superintendent "about the water service to the new Jefferson County Jail site," attaching a proposed water service layout for the site and other specs for review. The email reiterated that "[a]s discussed previously," Dupont's three-inch main was "not sufficient for the site," so DLZ hoped that Dupont could connect to Madison's 12-inch main to serve the jail. The engineer asked that Dupont "please provide any resolution to this by" November 6.[1]

November 6 came and went, and Dupont did not propose a solution to its infrastructure problem. On November 11, the DLZ engineer followed up, asking for confirmation that "Dupont has talked to the City of Madison about the connection" to its 12-inch main. Again, nothing from Dupont. And the following month, text messages between Dupont's Board President and a Jefferson County commissioner confirm that Dupont was aware it needed a larger pipe to serve the jail, but there is no evidence Dupont had a plan to achieve that end.

Although it took few actual steps to serve the jail, Dupont was quick to assert its monopoly right to do so. In January of

---

[1] Dupont argues in its reply brief that this October 29 email is inadmissible hearsay. This objection was scantily developed both below and on appeal, and this email is pertinent not to prove the truth of the matter asserted (*i.e.*, that Dupont's infrastructure was insufficient) but to prove the effect on the listener (*i.e.*, that Dupont received DLZ's communications about the jail). *See, e.g.*, *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) ("Statements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay."). But even if we were to exclude this email, our ultimate conclusions would not change.

2021, Dupont sent a letter to Jefferson County stating that the jail site "is located in the service area of Dupont Water Company that is protected pursuant to 7 U.S. Code § 1926(b)," which "grants federally indebted rural water associations the absolute right to be the exclusive seller of water within their service area." The letter requested that "the engineering company and other planners with respect to the Jefferson County Jail project contact Dupont Water Company with respect to planning for water service at the new jail site." Of course, those conversations had already commenced and were ongoing.

Meanwhile, in addition to the conversations about *how* Dupont could provide water to the jail, there were also conversations about *how much* the water would cost. For example, in February of 2021, a Jefferson County commissioner texted Dupont's Board President to ask about the water rate for the jail. And in March, Jefferson County sent Dupont a letter reiterating that the jail "will require a water connection," acknowledging that the site "is located within the Dupont Water Company district," and "requesting rate information on the cost for water supplied to the new jail facility … by Thursday, 18 March if possible." The letter informed Dupont that the jail would require an estimated 36,000 gallons of water per day.

Also in March, a Jefferson County commissioner attended a Dupont Board meeting to discuss the jail project, informing the Board that site preparation would begin in May of that year and that construction would take about two years. The parties discussed the fact that Dupont lacked a high-volume rate schedule. The meeting minutes state that Dupont would contact Sherman, Barber & Mullikin, an accounting firm, to create a rate schedule appropriate for the jail's anticipated

volume. The next day, as requested during the meeting, DLZ provided Dupont the jail project specifications and water system drawings. And the Dupont Board's April meeting minutes note that Dupont was "working on a quote for … the jail project" and that Sherman, Barber & Mullikin was "going to do a study for the jail project."

But Dupont never provided that high-volume rate quote for the jail. In the meantime, Jefferson County sent a letter to Madison requesting its rate information as well, and Madison responded within days with a letter comparing the two water providers' existing rates. (Madison's rate schedule, unlike Dupont's, already had a high-volume price.) At a Jefferson County Council meeting in May of 2021, council members expressed concern that the jail's opening would be delayed if water service was not secured soon. So, following "much discussion," the County Council voted to support acquiring water service from Madison—which, unlike Dupont, already had the 12-inch main necessary to meet the jail's volume needs and had provided its high-volume rates.

On Dupont's end, progress remained elusive. An accountant from Sherman, Barber & Mullikin emailed Dupont in May of 2021, stating that he could not "determine a rate" for the jail's water until Dupont's engineer provided a cost estimate for the new infrastructure required to service the jail. Dupont did not provide its accountant with such an estimate, and the accountant was never able to complete his rate study for the jail. Nonetheless, about two weeks later, Dupont sent Jefferson County a letter stating that Dupont was conducting a rate study "to formulate a rate appropriate for serving such a large volume user as the proposed jail … in an effort to be a good corporate citizen and be fair to all concerned." The same letter

reiterated that the jail site was located "in the service area covered by Dupont" and protected by § 1926(b), which means that "Jefferson County simply does not have the right to pick and choose the entity to provide water to the new jail" and "Dupont is the entity from whom Jefferson County needs to purchase water from for the jail."

Despite having lined up potential water service from Madison, Jefferson County continued to try working with Dupont to serve the jail. But nothing came together. In June of 2021, Jefferson County twice asked for an update on Dupont's rates, to no avail. In August, the County asked again—still nothing. Dupont, in turn, asked its accountant for an update on the rate study, and the accountant reminded Dupont: "As I think you know, I can't really go any further in making those calculations until we know what it will cost to put the facilities in place to serve the jail." In September, Madison informed Dupont that it could not use Madison's existing 12-inch water main to service the jail, further confirming that Dupont would need to hire an engineer to determine how to proceed. Yet Dupont did not do so.

With no progress to report on Dupont's end, communications between the parties tapered off. By the end of 2022, the jail was nearing completion. Dupont still did not have the infrastructure necessary to provide water to the jail, nor any plan to build it. Dupont never sent the County a proposed contract for water service at the jail, nor even the promised rate quote. Jefferson County ultimately moved forward with buying water from Madison for the jail, connecting to Madison's 12-inch water main in December of 2022.

*C. This Litigation*

In response, Dupont brought this suit against Madison in March of 2023, alleging that Madison was violating 7 U.S.C. § 1926(b) by providing water to the jail. Dupont sought declaratory relief under 28 U.S.C. § 2201 and damages and injunctive relief under 42 U.S.C. § 1983.[2]

Once in litigation, and after the jail was already operating, Dupont finally started to investigate how it could physically provide water to the jail. In August of 2023, Dupont requested that DLZ provide drawings of the jail project—the same drawings that DLZ had provided Dupont over two years earlier. And in December of 2023, Dupont's Board voted to "retain the services of an engineering firm to document that [Dupont] would be able to provide water service to the new jail." Dupont did so, and its expert has since opined that Dupont could serve the jail in one of three ways. According to Dupont's expert, the cheapest and fastest option—connecting to Madison's 12-inch main, assuming Madison allowed it—could be implemented within about seven days at a cost of about $10,000. The other two options—each requiring Dupont to construct its own main—could be implemented within 90-180 days at a cost of about $482,000 to $524,160. (Madison's expert disagrees with these estimates, but for purposes of this appeal we assume this dispute would be resolved in Dupont's favor.)

Jefferson County intervened in this litigation, seeking a declaratory judgment that its agreement with Madison for

---

[2] Although not at issue in this appeal, Dupont similarly challenged Madison's provision of water service to River City Printing, another user in the area.

water service at the jail was lawful and damages for any interference with that agreement by Dupont. Dupont counterclaimed that Jefferson County, too, had violated § 1926(b) by purchasing water service from Madison.

The parties cross-moved for summary judgment. The district court granted summary judgment in Madison's and Jefferson County's favor, finding that they had not violated § 1926(b) because no reasonable jury could find that Dupont had "made service available" to the jail as required to trigger § 1926(b)'s protections. Specifically, the district judge reasoned that Jefferson County had requested water for the jail from Dupont, but Dupont had not even determined the feasibility of servicing the jail until nine months after initiating this litigation. Dupont now appeals.

## II. Discussion

We review the district court's ruling on a motion for summary judgment *de novo*, construing all facts and making all reasonable inferences in the light most favorable to the non-moving party. *See Washington Cnty.*, 77 F.4th at 524–25. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

To recap the legal framework: Under our precedent, § 1926(b) prohibits a municipality "from selling water in an area that a USDA-indebted rural water association has 'provided or made available' its service." *Washington Cnty.*, 77 F.4th at 521 (quoting § 1926(b)). In order to demonstrate that it "provided or made available" water service to the jail, Dupont attempts to satisfy the "physical capability" test. *Id.* (citation omitted). In dispute here is the first prong of that

test—whether Dupont had "pipes in the ground," meaning "water pipes either within or adjacent to the disputed area" and the ability to provide service "within a reasonable time after a request for service occurs." *Id*. at 522 (citation omitted). (There is no dispute about the second prong of the physical capability test; the parties agree that Dupont was legally allowed to service the jail.)

In most cases, whether a water association would be able to serve a new customer "within a reasonable time after a request for service" is a hypothetical question, requiring some speculation about the water association's capabilities based on its existing infrastructure. But in this case, we need not hypothesize. As a matter of historical fact, Dupont did not provide water to the jail "within a reasonable time after a request for service." Instead, Dupont sat on its hands for years, doing nothing much other than asserting its monopoly rights, while the County built the jail and Madison procured water for it. We affirm the district court's decision on that basis.

Madison alternatively asks us to overrule *Jennings Water* and hold that § 1926(b) prohibits only the types of competition listed in the statute's text. While we have no reason to reach that far here, Madison has raised serious questions about our § 1926(b) precedent that may warrant attention in a future case.

### A. Whether Dupont "Provided or Made Available" Water Service Within a Reasonable Time

Dupont's central argument in this appeal has a Kafka-esque feel to it: It argues that Jefferson County never requested water service for the jail. As a result, Dupont contends, its years-long delay in providing an infrastructure plan

or a rate quote is irrelevant. Instead, Dupont asks us to focus on its expert testimony, prepared during this litigation, estimating that it could now construct the necessary infrastructure in anywhere from one week to about six months.

In a different case, it might be reasonable—indeed, necessary—to rely on engineering or other expert reports produced in litigation to determine how long it might take a water association to connect to a new customer. *See, e.g.*, *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 707 (6th Cir. 2003); *cf. Washington Cnty.*, 77 F.4th at 524–25 (noting parties' reliance on competing experts to analyze water utility's capacity, which was relevant to second prong of physical capability test). If, for example, Dupont had been uninvolved during the jail's construction and Madison's provision of water to the jail had taken everyone by surprise, then Dupont's experts might be the only source of evidence about whether Dupont could serve the jail within a reasonable time. But the opposite is true here. Contrary to Dupont's contention, the undisputed facts establish that Jefferson County did ask Dupont to provide water for the jail, and that Dupont did not do so within a reasonable time.

We need little more than common sense to reach this conclusion. The jail was a large facility with substantial water needs, and Jefferson County reached out to Dupont years before the jail was complete in order to set up service. DLZ's very first communication with Dupont reflected its understanding that Dupont would provide water for the jail: DLZ "look[s] forward to working with [Dupont] on the project!" In the months that followed, the parties discussed Dupont's service, including conversations about the jail's anticipated water needs, Dupont's corresponding need to access a larger

water main, and high-volume water pricing. Dupont itself sent Jefferson County two letters citing § 1926(b) and declaring itself "the entity from whom Jefferson County needs to purchase water from for the jail." Considered individually or in total, any reasonable juror would interpret these communications as a request for water service.

Dupont's arguments otherwise miss the mark. First, Dupont argues that Jefferson County never filled out the official "application" necessary to secure water service. This application appears nowhere in the record, and Dupont's position is based on a single line of deposition testimony suggesting that customers generally request service by contacting the Dupont office, filling out an application, and paying a membership fee. That may be Dupont's normal practice for run-of-the-mill users. But the jail was a massive construction project that would require so much water that Dupont needed new infrastructure and pricing. It therefore borders on absurd to suggest that despite years of communication between Jefferson County and Dupont about this project, Jefferson County never requested service because it did not fill out an application at the Dupont office. Indeed, Dupont's January 2021 letter to Jefferson County directed the County not to visit the office and fill out an application, but to "contact Dupont Water Company with respect to planning for water service at the new jail site." Jefferson County did just that.

Second, Dupont claims that the discussions between the parties show that Jefferson County was impermissibly rate shopping between Dupont and Madison. But this position, too, lacks support in the record. The fact that Jefferson County (a steward of taxpayer dollars) wanted to know Dupont's high-volume rate makes good sense in the context of the

parties' extensive communications about water for the jail. And it is undisputed that Jefferson County did not contact Madison about potential rates until March of 2021, nearly a year after it first began discussing water service with Dupont. That Jefferson County began exploring other options when Dupont still had not confirmed that it was physically able to supply water to the jail did not nullify Jefferson County's many requests for water service from Dupont.

To be clear, if Jefferson County was simply shopping for the best rate, one glance at the rate comparison chart would have made its choice obvious:

| City of Madison Water Rates | | | Dupont Water Rates | |
| --- | --- | --- | --- | --- |
| First 5,000 Gallons | $2.37 | | First 3,000 Gallons | $9.68 |
| Next 15,000 Gallons | $2.05 | | Next 3,000 Gallons | $7.61 |
| Next 30,000 Gallons | $1.75 | | Next 4,000 Gallons | $6.13 |
| Over 50,000 Gallons | $1.47 | | Next 10,000 Gallons | $4.95 |
| | | | Over 20,000 Gallons | $4.37 |

But despite this rate differential, and even after voting in May of 2021 to support acquiring water service from Madison, Jefferson County continued to try working with Dupont. Jefferson County sought updates from Dupont in June and August of 2021, both to no avail. Meanwhile, Dupont, apparently content to rest on its legal monopoly, did not provide Jefferson County with an infrastructure proposal, a high-volume rate, or a water contract.

On this record, no reasonable jury could find that Jefferson County failed to request water service from Dupont. And because this request was met with years of inaction, no reasonable jury could conclude that Dupont "provided or made available" water service, § 1926(b), within "a reasonable time," *Washington Cnty.*, 77 F.4th at 522 (citation omitted). Dupont's litigation experts can do nothing to rebut that

historical fact. The district court was therefore correct to grant summary judgment to Madison and Jefferson County on Dupont's § 1983 and § 2201 claims. Under our precedent, Madison did not violate § 1926(b) by providing water to the jail.[3]

### B. *Revisiting* Jennings Water

Madison requests, alternatively, that we overrule our decision in *Jennings Water* and hold that § 1926(b) prohibits only the enumerated forms of competition identified in the statutory text: (1) "inclusion of the area served by such association within the boundaries of any municipal corporation or other public body"; or (2) "the granting of any private franchise for similar service within such area during the term of such loan." Under that framework, a municipality like Madison would never face § 1926(b) liability merely for serving a new water customer.

We need not take up that invitation here, because Dupont's claims fail under our existing § 1926(b) case law. But Madison does have a point. *Jennings Water* acknowledged that the statutory text forbids only "municipal encroachment on a rural water association's service area by means of annexation or grant of private franchise." 895 F.2d at 314. But after considering legislative history, statutory purpose, and the decisions of other federal courts, *Jennings Water* adopted a "liberal interpretation" of § 1926(b) that also forbids "a municipality's encroachment" by "expanding its water sales to consumers

---

[3] Jefferson County also argues that as a water service *customer*, rather than a municipal water provider or other competitor, it cannot be held liable under § 1926(b). Because Dupont's claims against both defendants otherwise fail on the merits, we need not reach this question today.

located within [a] rural association's territory." 895 F.2d at 315. As a result, water associations like Dupont may now claim that any municipal competition for water customers violates § 1926(b).

*Jennings Water* is in good company: It was not the first federal court to expand § 1926(b), and multiple other circuits have since followed suit. *See, e.g.*, *City of Madison v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1059–60 (5th Cir. 1987); *Glenpool Util. Servs. Auth. v. Creek Cnty. Rural Water Dist. No. 2*, 861 F.2d 1211, 1214 (10th Cir. 1988); *Bell Arthur Water Corp. v. Greenville Utils. Comm'n*, 173 F.3d 517, 524, 526 (4th Cir. 1999); *Ross Cnty. Water Co. v. City of Chillicothe*, 666 F.3d 391, 397 (6th Cir. 2011). No court of appeals has squarely rejected our interpretation. But a few have acknowledged the tension between this prevailing view of § 1926(b) and the statute's actual text. *Chesapeake Ranch Water Co. v. Bd. of Comm'rs*, 401 F.3d 274, 281 n.4 (4th Cir. 2005); *Pub. Water Supply Dist. No. 3 v. City of Lebanon*, 605 F.3d 511, 516 n.4 (8th Cir. 2010).

This case and others like it suggest that our departure from § 1926(b)'s text may sometimes have troubling consequences. In this litigation, Dupont does not seek to use § 1926(b) as a shield to defend its existing water business from "municipal encroachment" such that Dupont can continue to pay off its USDA loan. Instead, Dupont employs § 1926(b) as a sword, arguing that it gives Dupont a monopoly on providing water service to a brand new, huge water customer. Dupont leverages the "pipes in the ground" test to support that offensive use of § 1926(b), claiming a monopoly wherever Dupont has "water pipes … adjacent to the disputed area" such that it is "capable of providing service to the disputed area within a reasonable time." *Washington Cnty.*, 77 F.4d at

522 (citations omitted). When combined with *Jennings Water*, that test might give a water association like Dupont "the ability to expand its exclusive franchise area unilaterally and limitlessly" simply by building pipes. *Chesapeake Ranch Water Co.*, 401 F.3d at 280 (noting risk that a water association could "become the 'kudzu vine' of utility companies growing at [its] will or whim … simply through the installation of water lines to the edges of its ever expanding service area") (citation omitted).[4]

Providing water associations with powerful and expanding legal monopolies seems unlikely to benefit the rural and agricultural water users that Congress originally sought to help. Again, take this case as an example. Armed with a § 1926(b) monopoly, Dupont has behaved as we might expect, at least with respect to the jail: Its customer service was sluggish, its water rates were much higher than Madison's, and it has openly warned that its potential customers "do[] not get to shop for rates and find the utility that's going to give them the best deal," Oral Arg. at 4:56–5:02. Although Madison was able to provide water to the jail for a lower price and with less added infrastructure, Dupont insisted that it had "the absolute right to be the exclusive seller of water" to the jail, R.107-12 at 1. Under our interpretation of § 1926(b), that claim was plausible enough that Jefferson County spent years

---

[4] In some cases, state law might provide a check on offensive uses of § 1926(b). *See, e.g.*, *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 709 (6th Cir. 2003) (limiting offensive use of § 1926(b) by holding that "when a rural water district's boundaries are geographically determined by the state, a rural water district cannot use § 1926(b) to obtain new customers outside that geographic area"). But that limitation does not exist here.

trying to buy water from Dupont, and the parties have now spent years fighting about it in court.

Our expansion of § 1926(b) thus may well discourage the very development in rural areas that Congress sought to foster, by "prohibit[ing] cities from providing [water] services to customers … even when the city is perhaps better situated to do so." *Pub. Water Supply Dist. No. 3*, 605 F.3d at 520. Section 1926(b)'s text suggests that Congress did not intend to insulate USDA-indebted water associations from *all* forms of competition. Perhaps for good reason. In an appropriate case, we should consider revisiting our precedent interpreting this statute.

* * *

The district court's judgment is

AFFIRMED.